In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00162-CR
______________________________


BENJAMIN SHANNON RHODES, Appellant
Â 
V.
Â 
THE STATE OF TEXAS, Appellee


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

On Appeal from the 6th Judicial District Court
Lamar County, Texas
Trial Court No. 17976


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Justice Ross


MEMORANDUM OPINION

Â Â Â Â Â Â Â Â Â Â Benjamin Shannon Rhodes appeals from his conviction by a jury for manslaughter. 
The jury assessed his punishment at ten years' imprisonment and recommended Rhodes
be placed on community supervision. The court sentenced Rhodes in accordance with the
jury's verdict and placed him on community supervision for ten years.
Â Â Â Â Â Â Â Â Â Â The record shows that the victim, Michael Borders, confronted his ex-wife at a
nightclub in a jealous rage. She was at a table with Rhodes, Rhodes' girlfriend, and
several others. The record also shows that Rhodes had been told Borders had knocked
the windshield out of Borders' ex-wife's car. Rhodes was about fifteen years older than
Borders and testified he had known Borders all his life. Rhodes weighed about 170
pounds, while Borders weighed 285 pounds. Rhodes testified that Borders threatened him
on the night in question and that he went outside the nightclub with Borders because
Rhodes thought he could calm down Borders if they were in a more private area. There
was testimony that others, including two of Borders' friends, followed them outside. 
Rhodes testified that, after they got outside, he became afraid and pulled out his knife. 
Borders hit Rhodes in the face and knocked him down, partially under a car. At some
point, Rhodes cut Borders on the arm, and after Borders was on the ground, cut him on
the leg. Borders was taken to a hospital, but the leg injury severed the femoral artery, and
he bled to death. The evidence also shows that Rhodes sustained a puncture wound to
an arm during the fight that severed a major artery, but the cause of that injury is unclear. 
The medical testimony was that, if Rhodes had not received prompt treatment by a
tourniquet, he would have bled to death. 
Â Â Â Â Â Â Â Â Â Â Rhodes contends he received ineffective assistance of counsel during the trial of
this cause. Specifically, he contends counsel was ineffective for failing to cross-examine
Mike Byrd, one of Borders' companions, about conflicting statements, first to police officer
Kevin Jenkins, at the scene, that Rhodes was defending himself when he drew his knife;
and second, at trial, that Rhodes drew the knife before any punch was thrown. 
Â Â Â Â Â Â Â Â Â Â Rhodes also contends counsel was ineffective for failing to call a material witness,
Pam Dill. Rhodes contends this witness was interviewed by the police after the altercation
and told the officers she did not see Rhodes with a knife while he and Borders were
fighting. 
Â Â Â Â Â Â Â Â Â Â The standard of testing claims of ineffective assistance of counsel is set out in
Strickland v. Washington, 466 U.S. 668 (1984), and adopted for Texas constitutional
claims in Hernandez v. State, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986). To prevail on
this claim, an appellant must prove by a preponderance of the evidence (1) that his or her
counsel's representation fell below an objective standard of reasonableness, and (2) that
the deficient performance prejudiced the defense. Strickland, 466 U.S. at 687; Rosales
v. State, 4 S.W.3d 228, 231 (Tex. Crim. App. 1999). To meet this burden, the appellant
must prove that the attorney's representation fell below the standard of prevailing
professional norms and that there is a reasonable probability that, but for the attorney's
deficiency, the result of the trial would have been different. Tong v. State, 25 S.W.3d 707,
712 (Tex. Crim. App. 2000). Under this standard, a claimant must prove that counsel's
representation so undermined the proper functioning of the adversarial process that the
trial cannot be relied on as having produced a just result. Strickland, 466 U.S. at 687. 
Â Â Â Â Â Â Â Â Â Â As far as strategic or tactical reasons for counsel's action or inaction, in the absence
of direct evidence of counsel's reasons for the challenged conduct, an appellate court will
assume a strategic motivation if any can be imagined. Garcia v. State, 57 S.W.3d 436,
440 (Tex. Crim. App. 2001). We will not conclude the challenged conduct constitutes
deficient performance unless the conduct was so outrageous that no competent attorney
would have engaged in it. Id.; see Thompson v. State, 9 S.W.3d 808, 814 (Tex. Crim. App.
1999).
Â Â Â Â Â Â Â Â Â Â Rhodes contends the inconsistent statement made by Byrd to Jenkins was
contained in Jenkins' written report. We note first that Jenkins did not testify, and second,
there is no indication his report was ever presented to the jury or introduced into evidence. 
Further, counsel has directed us to no location in the record that would support his
contention regarding the contents of that report. Likewise, counsel has not directed us to
any location in the record that would support his contention regarding Dill's statements to
the police. In such a situation, the record does not support the contentions made, and we
cannot meaningfully address the issue. 
Â Â Â Â Â Â Â Â Â Â Even assuming these statements were made by Byrd and Dill, in the absence of any
explanation by trial counsel of his reasons for not examining these witnesses on these
issues, it would be difficult to find he had no conceivable strategic reason for not doing so. 
The contention of error is overruled.
Â Â Â Â Â Â Â Â Â Â We affirm the judgment.


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Donald R. Ross
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice

Date Submitted:Â Â Â Â Â Â October 11, 2004
Date Decided:Â Â Â Â Â Â Â Â Â October 28, 2004

Do Not Publish



ve fresh bruises.Â .Â .Â .Â There were some
bruises on his leg thatÂ .Â .Â .Â raised clear concerns that there were older bruises as well."

 The defense theory at trial opined the possibility that Hurst had inflicted the bodily injury to
C.S. Hurst was a nurse for an assisted living home. Because she oversaw the medication room, she
had access to liquid morphine. At trial, Hurst denied taking any action which would cause bruising
to C.S.'s private areas. She went to work at 5:45 a.m. on the day in question and returned home
before 8:30 p.m. Hurst told the jury she called the ambulance, which arrived at 9:00, immediately
after checking on C.S. She had left C.S. in Barbour's care for the day. Hurst denied giving C.S.
Benadryl or morphine. 

 Toxicologist Chris Heartstill testified that morphine is metabolized by the body within ten
to twenty hours. Based on his testing, which occurred at 11:00 a.m. the day after C.S. was brought
to the hospital, Heartstill stated it was reasonable to conclude the morphine was given to C.S. around
noon the day before. Again, C.S. was in Barbour's exclusive care when the morphine could have
been administered. Dr. Cox explained that morphine will "kick in within half an hour to an hour,
and it has relatively quick symptoms." 

 These symptoms were witnessed by Matthew Sugg, C.S.'s eight-year-old friend, who went
to C.S.'s home around 4:00 or 5:00 p.m. on the day of the incident. Sugg testified Barbour opened
the door, let him in, but told him C.S. was asleep. Sugg went to C.S.'s room anyway and saw that
he was sleeping and "his eyes and lips were bluish." He witnessed Barbour "[s]quirting [C.S.] in
his face with" a water bottle. C.S. did not wake up. This testimony was contrary to Barbour's story
to Boatwright that C.S. was alert and playful after the alleged fall. 

 Chris Upchurch was in jail with Barbour. Upchurch testified Barbour 

 told me that his girlfriend was a nurse and that she was stealing drugs from the
nursing home or taking drugs from the nursing home from the elderly patients. And
they were taking them and either selling them -- using some and selling some of the
others.Â .Â .Â .Â Then he told me that the reason he was there is that he sold or gave some
liquid morphine to a cousin of hers or relative of hers and they took -- they drank it
and it caused them to go into a coma and had a real adverse effect upon them.Â .Â .Â . He
said, stupid son-of-a-bitch drank the liquid morphine and had an adverse effect on
him and went into a coma and almost died.


 After hearing the evidence, the jury convicted Barbour on both counts of injury to a child. 

II. Legally and Factually Sufficient Evidence Supported the Jury's Verdict

 A. The Hypothetically Correct Jury Charge

 Our analysis of whether the evidence is legally and factually sufficient is measured against
the elements of injury to a child with the same kind of analysis as that applied in the test for a
hypothetically correct jury charge for the case. (1) Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim.
App. 1997); see also Grotti v. State, 273 S.W.3d 273, 280 (Tex. Crim. App. 2008). The
hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not
unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of
liability, and adequately describes the particular offense for which the defendant was tried." Malik,
953 S.W.2d at 240. It is used to evaluate both legal and factual sufficiency. Grotti, 273 S.W.3d at
281. 

 Barbour was indicted for intentionally or knowingly causing serious bodily injury to a child
in violation of Section 22.04(a)(1) of the Texas Penal Code. Tex. Penal Code Ann. §Â 22.04(a)(1)
(Vernon Supp. 2009). Under a hypothetically correct charge in this case, the jury was required to
find, beyond a reasonable doubt, that: (1) Barbour; (2) intentionally or knowingly; (3) caused C.S.,
a child; (4) serious bodily injury. Id. The degree of harm to the child (serious bodily injury versus
bodily injury), and the intent requirement (intentionally or knowingly versus recklessly or with
criminal negligence), determine the grade of the offense. Tex. Penal Code Ann. Â§ 22.04(e)
(Vernon Supp. 2009). Serious bodily injury is "bodily injury that creates a substantial risk of death." 
Tex. Penal Code Ann. Â§ 1.07(46) (Vernon Supp. 2009). 

 Also, injury to a child is a result oriented crime because the focus of the mens rea is on the
result of the conduct, not the conduct itself. Haggins v. State, 785 S.W.2d 827, 828 (Tex. Crim.
App. 1990); Patterson v. State, 46 S.W.3d 294, 301 (Tex. App.--Fort Worth 2001, pet. ref'd); Banks
v. State, 819 S.W.2d 676, 678 (Tex. App.--San Antonio 1991, pet. ref'd). "What matters is that the
conduct (whatever it may be) is done with the required culpability to effect the result." Alvarado
v. State, 704 S.W.2d 36, 39 (Tex. Crim. App. 1986); see Dunn v. State, 13 S.W.3d 95, 97-98 (Tex.
App.--Texarkana 2000, no pet.). Thus, "it is not enough for the State to prove that [Barbour]
engaged in conduct with the requisite criminal intent, the state must also prove that [Barbour] caused
the result" intentionally or knowingly. Delgado v. State, 944 S.W.2d 497, 498 (Tex. App.--Houston
[14th Dist.] 1997, writ ref'd); Lee v. State, 21 S.W.3d 532, 540 (Tex. App.--Tyler 2000, pet. ref'd)
(citing Cook v. State, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994)). It is this intent to cause the
result that is the focus of Barbour's appeal. 

 For this offense, Barbour acted intentionally if it was his "conscious objective or desire to
.Â .Â . cause the result." Tex. Penal Code Ann. Â§ 6.03(a) (Vernon Supp. 2009). He acted knowingly
if he was "aware that his conduct [was] reasonably certain to cause the result." Tex. Penal Code
Ann. Â§ 6.03(b) (Vernon Supp. 2009). 

 B. The Evidence Was Legally Sufficient to Support the Verdict 

 The requirement of legal sufficiency confirms that a fact question was raised by the evidence. 
Clewis v. State, 922 S.W.2d 126, 133 (Tex. Crim. App. 1996). If the evidence in this case was
insufficient to raise an issue of Barbour's guilt, there was no issue for the jury's resolution. Id. 
When conducting a legal sufficiency analysis, we review all of the evidence in the light most
favorable to the verdict and determine whether any rational jury could find the essential elements of
injury to a child as charged by the indictment beyond a reasonable doubt. Hooper v. State, 214
S.W.3d 9, 13 (Tex. Crim. App. 2007); Lacour v. State, 8 S.W.3d 670, 671 (Tex. Crim. App. 2000)
(citing Jackson v. Virginia, 443 U.S. 307 (1979)); Clewis, 922 S.W.2d at 132-33; Saxton v. State,
804 S.W.2d 910, 914 (Tex. Crim. App. 1991). 

 When reviewed in a light most favorable to a finding of guilt, C.S. testified Barbour gave him
medicine which made him dizzy. Upchurch recounted Barbour's statements in jail that he gave
someone morphine. Heartstill's toxicology report indicated morphine was given to C.S. around noon
on the day C.S. was taken to the hospital by ambulance. According to Hurst, Barbour was left to
take care of C.S. on that day. C.S.'s friend Sugg testified that Barbour was the only adult in the
home when he went to visit and that Barbour attempted to wake C.S. up by squirting him in the face
with a water bottle around 4:00 or 5:00 p.m. A rational jury could have found Barbour administered
the morphine to C.S. 

 Heartstill stated "any morphine given to an eight year old is going to be a dangerous dose and
could be lethal." Dr. Clark also concluded opiates could cause serious bodily injury, and Dr.Â Cox
stated morphine given to an eight year old could be considered a deadly weapon. (2) Vrba and Cody
described C.S. as being on the verge of death when he arrived in the PRMC emergency room. 
Dr.Â Clark explained that the morphine ingestion explained C.S.'s critical condition caused by
respiratory failure. A rational jury could have found Barbour's administration of morphine to C.S.
caused him serious bodily injury which created a substantial risk of death.

 Finally, a rational jury could have determined Barbour administered the morphine to C.S.
with awareness that his conduct was reasonably certain to cause C.S. serious bodily injury. 
Barbour's brief states "[t]here was no direct evidence that Mr. Barbour knew that morphine would
cause serious bodily injury." Even putting aside common sense and the general knowledge of the
hazards of morphine, Barbour's requisite culpable mental state can be inferred from surrounding
circumstances, his acts, words, and conduct, and from the extent of C.S.'s injuries. Patrick v. State,
906 S.W.2d 481, 487 (Tex. Crim. App. 1995); Ledesma v. State, 677 S.W.2d 529, 531 (Tex. Crim.
App. 1984); Dunn, 13 S.W.3d at 98-99. Here, C.S. described a pattern of physical injury and abuse
by Barbour. Sugg testified he saw Barbour spraying a nonresponsive, "bluish" C.S. in the face with
a water bottle around four or five o'clock in the evening. Despite Barbour's knowledge that C.S.
was nonresponsive, he did not notify Hurst or call an ambulance. Instead, he waited several hours
for Hurst to return home, find her son, and call an ambulance. A jury may reasonably infer that the
defendant intentionally, not accidentally, inflicted an injury when he or she fails to render aid known
to be needed. Tezino v. State, 765 S.W.2d 482, 485 (Tex. App.--Houston [1st Dist.] 1988, pet.
ref'd).

 The jury was also entitled to consider other abusive conduct toward the child by the
defendant. Id. C.S. testified that Barbour had beaten him more than twenty times and committed
other acts of violence toward him. C.S. was bruised on his face, neck, legs, scrotum, penis, buttocks,
hip, and shins. The evidence established Barbour was not at the residence when the ambulance
arrived. He also never arrived at PRMC emergency room. It was not until 5:30 the following
morning that Barbour apeared at CMC. While there, nurses noticed that C.S. was uncomfortable
around Barbour, whose explanations to officers about C.S.'s condition were not found plausible. 
C.S. told officers that Barbour warned him to conceal what had happened by expressing that the
injuries were caused by a fall from a bicycle. After Boatwright interviewed C.S., Barbour left the
hospital. A reasonable inference also arises in the presence of proof that the defendant tried to
conceal the conditions that led to the victim's injuries. Id. We find that a rational jury could have
determined Barbour knowingly gave C.S. the morphine when he was aware that his conduct was
reasonably certain to cause the result of inflicting serious bodily injury on C.S. 

 Thus, we conclude the evidence was legally sufficient to find all elements of injury to a child
as alleged in the indictment to support the jury's verdict. 

 C. The Evidence Was Factually Sufficient to Support the Verdict 

 Unlike legal sufficiency review, we examine the evidence in a neutral light when assessing
factual sufficiency and determine whether the proof of guilt is obviously weak as to undermine
confidence in the verdict, or, if taken alone, is greatly outweighed by contrary proof so as to be
clearly wrong and unjust. Zuliani v. State, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); Johnson
v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000); Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim.
App. 1997); Harris v. State, 133 S.W.3d 760, 764 (Tex. App.--Texarkana 2004, pet. ref'd). A
clearly wrong and unjust verdict is manifestly unjust, shocks the conscience, or clearly demonstrates
bias. Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997). Because factual sufficiency
is an issue of fact, we are not free to reweigh the evidence and set aside the verdict merely because
we feel a different result is more reasonable. Clewis, 922 S.W.2d at 135. 

 The majority of contrary proof involved the defensive theory that Hurst administered the
morphine and beat C.S.--including her access to morphine at her job and her admission to spanking
C.S. with a belt three times a few days before. Since we have determined the evidence raised issues
for the jury's resolution, we will not sit as the thirteenth juror re-evaluating the weight and credibility
of the evidence. Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); Dewberry v. State,
4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Instead, we give full play to the jury's responsibility
to weigh the evidence, resolve conflicts in the testimony, and draw reasonable inferences from basic
facts. Johnson, 23 S.W.3d at 7; Clewis, 922 S.W.2d at 133; Bottenfield v. State, 77 S.W.3d 349, 354
(Tex. App.--Fort Worth 2002, pet. ref'd) (citing Jackson, 443 U.S. at 319).

 In reviewing all of the evidence in a neutral light, including Hurst's denial that she gave C.S.
morphine, and C.S.'s testimony, we cannot say the evidence of Barbour's guilt was greatly
outweighed by testimony reflecting the defensive theory. We find nothing unjust or shocking about
the verdict and conclude the evidence was factually sufficient to support it. 

III. Conclusion 

 We affirm the trial court's judgment. 



 Jack Carter 

 Justice


Date Submitted: January 4, 2010

Date Decided: January 27, 2010


Do Not Publish

1. Malik controls "even in the absence of alleged jury charge error." Gollihar v. State, 46
S.W.3d 243, 255 (Tex. Crim. App. 2001). 
2. Barbour does not contest the deadly weapon finding.